UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                            Case No. 8:07-CR-295-T-27MAP

JOHN C. GIOVANETTI
_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for a New Trial Based on Newly Discovered Evidence and Request for an Evidentiary Hearing (Dkt. 56), the United States' Response in Opposition (Dkt. 60), Defendant's Amended Motion for New Trial (Dkt. 63), and Second Amended Motion for New Trial (Dkt. 66). A hearing on the motions was conducted on May 12, 2008. During the hearing, the motions were denied. This Order memorializes that ruling.

Defendant was convicted of one count of conspiracy to commit wire and bank fraud, eleven counts of wire fraud and eleven counts of bank fraud. (Dkt. 49). In his motions, Defendant alleges that after trial, his private investigator determined that the Orlando Police Department has possession of copies of the hard drives from the stand alone computers used by Government witnesses Edward Littlejohn and Kelly Roth when they were employed at the dealership owned by Defendant, Big Oaks Buick, Pontiac, GMC, Inc. (BOBP). Defendant alleges that prior to trial, the Government represented to his attorney that the software and hardware utilized at the dealership "no longer existed" because the receiver for BOBP had returned it Reynolds & Reynolds, its proprietor, and that the original hard drives of the stand alone computers used at the dealership, including the computer used by Littlejohn had been "erased in 2004 or 2005." Defendant essentially contends that the

-1-

existence of the hard drives constitutes newly discovered evidence. Defendant relies on two distinct categories of newly discovered evidence which would ostensibly be found on the hard drives. He contends that the hard drives contain certain dealership financial data Defendant believes was manipulated by Littlejohn and Roth, and that child pornography will be found on Littlejohn's computer.

Defendant includes claims under *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972). He contends that the Government violated his rights by "not taking physical possession of the 3 desktop computers, and then misleading Giovanetti into believing the computer records no longer existed when, in fact, the government knew those records were in the possession of the Orlando Police Department and/or the agents of SunTrust Bank." (Dkt. 66, p. 6).

Defendant's motion necessarily fails because the Government never had possession of the stand alone computers or the hard drives used by Roth and Littlejohn and was not aware that the hard drives had been copied and provided to the Orlando Police Department. Moreover, prior to trial, the Government disclosed the existence of suspected pornography on Littlejohn's computer. Further, Defendant's attorney independently learned, before trial, that the Polk County Sheriff's Office had investigated and found child pornography on Littlejohn's computer.

The Government's purported failure to take possession of the computers and hard drives did not constitute a *Brady* violation. Even if the hard drives were available to the Government and the Government could have, but did not provide them to the defense, that non-disclosure does not undermine confidence in the jury's verdict and trial.

**Financial data**

Defendant alleges that after trial, he was advised by a forensic computer expert that BOBP's "accounting and financial system can likely be accurately reconstructed by means of forensically examining the hard drive images" on the desk top computers used by Littlejohn and Roth. Defendant contends that he "has also discovered that the forensic examination of the hard drive images should also produce the ability to determine which computer and which user made entries, deletions, to other modifications to accounting data."

Defendant surmises: "If the newly discovered evidence proves accurate– then there was no accuracy or truth whatsoever to the government's prior representation(s) about the Reynolds & Reynolds financial and accounting data being irretrievably 'gone.'" Further, Defendant contends: "Based on the newly discovered evidence, there is substantial reason to believe that: (1) the duplicated hard drives can be obtained and used to fully reconstruct the entries and data of the dealership's sophisticated accounting and financial systems; and (2) the financial software data so obtained can be examined for indicia of manipulation and theft that could not be revealed by merely examining hard-paper copies of the records."

**Child pornography**

Defendant alleges that approximately "a week before trial" his attorney advised him that the prosecutor had reported "the existence of suspected child pornography on the stand-alone computer used by Edward Littlejohn;-but the government was apparently not intending to prosecute him . . . due to Littlejohn's assertion that he was not the only individual with access to the computer." Defendant complains "that at no time prior to trial did the government produce, or offer to produce, the suggested pornography to the defense."

**Existence of the hard drives**

In his Amended Motion for New Trial, based on his private investigator's efforts, Defendant "believes he may have discovered the existence and whereabouts of the hard drive or duplicated hard drive corresponding to Mr. Littlejohn's desktop computer." (Dkt. 63, p. 4). The investigator avers that the receiver's attorney confirmed that pornography had been found on Littlejohn's computer and that this information had been reported to law enforcement. (Dkt. 63-2, at ¶ 8). The investigator searched the Orlando Police Department indexes and located an investigation under case number 05-24742. (Id. at ¶ 11). Defendant contends that this index search "confirms the existence of a child pornography investigation under number 05-24742 involving possible suspect Edward Scott Littlejohn." (Dkt. 63, p. 4, ¶ 6). Defendant proffers his "good faith basis to believe that the Orlando Police Department is in possession of Edward John Littlejohn's computer hard drive or its duplicate" and that "[i]f true, this would include, in part, the same computer information that the government's prosecutor previously represented 'no longer existed' in the weeks leading up to Giovanetti's trial." (Dkt. 63, p. 5, ¶ 7).

*Discussion*

The problem with Defendant's motion is three-fold. First, as demonstrated by the affidavit of the case agent, S.A. Daniel P. Kelly, FBI, the hard drives were never in the possession or control of the Government, the FBI or Kelly. (Dkt. 60-2, pp. 2-4). Second, the existence of child pornography on Littlejohn's computer was known to Defendant prior to trial. His attorney learned of the child pornography independently after the Government disclosed that "all kinds of pornography" had been found on the computer by the receiver when it was seized. Third, the location of the hard drives could have been discovered by Defendant before trial through the exercise

of due diligence.

**Government never had possession of hard drives**

Agent Kelly's affidavit establishes that the Government never had possession of the computers and hard drives. Agent Kelly avers that in response to Defendant's attorney's inquiry before trial, he contacted the receiver and former employees of BOBP and was told "no information of accounting value would be found on the hard drives of these stand alone computers." In September 2007, Kelly contacted SunTrust Bank "in search of these hard drives, with negative results."

It cannot be said, therefore, as Defendant contends, that there are "significant questions, currently unanswered, regarding the extent to which the FBI actually sought to locate the computer evidence in questions" (Dkt. 66, ¶ 8). Agent Kelly attempted, but was unable to locate the hard drives and computers. To the extent Defendant contends that Agent Kelly knew that the computers and hard drives were in the possession of the Orlando Police Department, Kelly's affidavit establishes otherwise.[1]

**Child pornography not newly discovered**

In August 2007, well before trial, the Government furnished Agent Kelly's FBI 302 form in which he described a March 2005 interview of the receiver and his attorney, Foster. At that time, the receiver told the agent that "all kinds of pornography was located on Littlejohn's computer after it was seized." Before trial, Defendant's attorney independently learned that child pornography had

---

[1] Defendant alleges that "[h]e also learned, subsequent to trial, that it would be standard operating procedure for the FBI to mirror the hard drives of any computer it intended to examine – thus making it extremely likely that government agents (and/or agents of SunTrust Bank) have long been in possession of duplicate hard drives corresponding to the desktop computers in question."

been discovered on Littlejohn's computer, and disclosed that to Defendant in a summary report on November 29, 2007, more than two months before trial (Dkt. 56, Affidavit of Giovanetti, ¶¶ 6, 14; Dkt. 63-2, Affidavit of James D. Younger, ¶ 4). The existence of child pornography on Littlejohn's computer is not, therefore, newly discovered evidence.

Defendant's attorney also knew that Littlejohn had reported to the Polk County's Sheriff's Office that "several people had access to his computer" and that no child pornography had been found on Littlejohn's personal laptop computer. For whatever reason, tactical or otherwise, counsel chose not to pursue the subject of child pornography with Littlejohn on cross examination. Counsel did vigorously cross examine Littlejohn as to his motives in testifying for the Government, reviewing Littlejohn's Plea Agreement extensively with Littlejohn during cross examination.

In Littlejohn's Plea Agreement, in exchange for his truthful testimony and cooperation, the Government promised not to prosecute him for any offenses it knew of other than the offense he pleaded guilty to. (Gov. Exh. 26). Having knowledge of what was found on Littlejohn's computer, defense counsel was equipped to pursue this line of cross examination without having the specific images of child pornography in available. Moreover, the existence of child pornography would at most be impeachment information, and only if Defendant could show that Littlejohn testified for the Government with an understanding or expectation that he would not be prosecuted for possession of child pornography. Proof that Littlejohn possessed child pornography would not, in and of itself, be admissible extrinsic evidence. See Rule 608(b), Fed. R. Evid.

**Exercise of due diligence**

"Newly discovered evidence is evidence that could not have been discovered with due diligence at the time of trial." *United States v. Johnson*, 596 F.2d 147, 148 (5th Cir. 1979)(citing

*United States v. Beasley,* 582 F.2d 337, 339 (5th Cir. 1978)).  Assuming that copies of the hard drives were in the possession of the receiver, his attorney, or the Orlando Police Department prior to trial, Defendant has not shown that the copies could not have been discovered through the exercise of due diligence. Defendant and his attorney knew, by virtue of Agent Kelly's FBI 302 form describing his March 2005 interview of the receiver, that the hard drives had been turned over to the receiver's attorney in Orlando, "for safe keeping and copying." (Dkt. 56, Giovanetti's Affidavit at ¶ 6).  While Defendant could not have actually gained possession of hard drives containing child pornography, locating the hard drives was the first step in securing whatever information was on the hard drives.  The information Agent Kelly learned in attempting to locate the hard drives has not been shown to be information Defendant could not have obtained.

Moreover, through discovery, the defense had access to the hard copies of the financial data maintained on the hard drives and spent time reviewing that data.  According to Kelly, all of the accounting and financial records in BOBP's system had been "reduced to hard copies and maintained in the normal course of BOBP business" and that those documents had been made available to Defendant before trial.  The FBI never "mirrored" the hard drives and never conducted a forensic examination of them. Furthermore, neither Kelly nor the FBI ever requested or received mirrored hard drives, never possessed the stand alone computer hard drives, "and therefore, was never in a position to make, or cause to be made, a 'mirror' image of said hard drives."

The last known location of the hard drives, according to Kelly, "was with Akerman Senterfitt of Orlando, Florida" and that firm "never supplied the hard drives, or mirror images thereof" of the computers to Kelly or the FBI.  Defendant knew that the receiver took possession of the computers and hard drives in October 2004 and that the receiver was represented by Akerman Senterfitt in

Orlando. If indeed there was information material to the defense on the hard drives, through the exercise of due diligence, Defendant could have learned as much before trial about where the hard drives were as he knows today. Prior to trial he was in as good of a position as the Government to locate the computers and hard drives through the exercise of due diligence. Defendant could have issued subpoenas to obtain access to the hard drives just as easily as the Government. *See United States v. Johnso*n, 596 F.2d at 149.

### *Standards*

"To succeed on a motion for new trial based on newly discovered evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result."*United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003); *see also Lynn v. United States*, 365 F.3d 1225, 1237 (11th Cir. 2004) (citing *Jernigan*). A motion for new trial will not be granted unless the defendant satisfies all five parts of this standard. *United States v. Reed*, 887 F.2d 1398, 1404 (11th Cir. 1989), *cert. denied,* 493 U.S. 1080 (1990). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995). "[M]otions for a new trial are highly disfavored, and [the] district court should use 'great caution' in granting a new trial motion based on newly discovered evidence." *Jernigan*, 341 F.3d at 1287 (citations omitted).

Regardless of the existence of the hard drives and what may be found on them through forensic examination, Defendant has not carried his burden of establishing that what he contends is newly discovered evidence would probably produce a different result, a necessary component of a

successful motion for new trial based on newly discovered evidence. *United States v. Jernigan*, 341 F.3d at 1287.[2]

. While the Government did, as Defendant suggests, "heavily rely on the testimony of Edward Littlejohn and Kelly Roth," those individuals were not the only "key witnesses." As the Government points out, two former employees of BOBP also testified as "key witnesses" against Defendant. Tammi Burton and Lisa Agnew testified that when the dealership came up short and was unable to pay the monthly payment on the floor plan financed by SunTrust, they were told by Defendant to "go to the closet."

"Going to the closet," accordingly to everyone other than Defendant, who denied having ever heard the phrase at the dealership, had particular significance in the scheme to defraud SunTrust. When instructed to "go to the closet," Burton or Agnew would retrieve an old deal file from the "closet," where the old deal files were maintained. Utilizing the vehicle identification number and description of the vehicle from the old deal, they would list that vehicle as a current sale on the monthly funding request faxed to SunTrust, essentially misrepresenting that the vehicle had been in inventory that month. "Going to the closet" was therefore a false "re-flooring" of a vehicle and the means of perpetrating the fraudulent scheme. Through these misrepresentations, Defendant and his co-conspirators effectively created fictitious sales supporting the monthly funding requests submitted to Sun Trust. At least three witnesses described Defendant's knowing participation in the scheme and his reference to "going to the closet" to accomplish the scheme's objectives.

---

[2] Defendant surmises that the data on the hard drives proves "that Littlejohn and Roth were secretly stealing from his dealership by means of manipulating BOBP's financial records and manipulating the dealership's floor plan credit arrangement with SunTrust," and that this would be consistent with his defense "that he was not acting in criminal concert with Littlejohn and Roth." (Dkt. 56, p. 6, ¶ 12).

Moreover, the jury heard testimony describing incriminating admissions made by Defendant after he was confronted by SunTrust officials Craig Hutchinson and Joseph Losch. Hutchinson, SunTrust's relationship manager with BOBP, initially contacted Defendant after becoming suspicious during a review of a September 2004 audit of BOBP's sales. On BOBP's August 2004 funding request, he noted a vehicle listed as having been sold that month which he knew had been purchased by Losch in 2002. Defendant told Hutchinson that it was a "clerical error" and promised to pay it off. Defendant called Hutchinson the same day and told him there were three more "units" and promised to pay them off that day. Defendant called again and told Hutchinson there were 7 or 8 more "units" and offered to meet in Orlando to discuss it.

The next morning, Hutchinson, Losch and Larry Pitts, a credit manager for SunTrust, went to the dealership to meet with Defendant. Defendant insisted on meeting only with Hutchinson and Losch. According to Hutchinson, when confronted, Defendant "cried some," was very disturbed, very upset and said he had made "some bad business decisions." Defendant told Hutchinson and Losch that SunTrust would not be happy with him and asked if "I could go to jail for what I've done?"[3]

Based on the credible testimony of Tammi Burton, Lisa Agnew, Craig Hutchinson and Joseph Losch, the newly discovered "evidence" Defendant contends would be found on the hard drives, even if available, would not "probably produce a different result."

---

[3] Moreover, Roth and Littlejohn described Defendant's knowledge of and participation in the "re-flooring" and actually pulling invoices and re-dating them in anticipation of an audit. According to Roth, "Going to the closet" was the same as "re-flooring." Defendant was overheard by Roth expressing his concerns to Littlejohn about whether Lisa was "comfortable" re-flooring and that if not, "she'll have to go."

-10-

Finally, as to the child pornography found on Littlejohn's computer, assuming for purposes of the motion that the hard drive containing the pornography is "newly discovered," a new trial is not warranted because it had only impeachment value. *See United States v. Riley,* 211 F.3d 1207, 1208 (11th Cir. 2000), *vacated in part on other grounds,* 232 F.3d 844 (11th Cir. 2000) (denial of new trial motion based on newly-discovered impeaching evidence as to a collateral matter not abuse of discretion).

### There was no Brady Violation

Defendant contends that the government failed "to disclose *Brady* materials to the defense" which "adversely impacted defense trial preparation." To obtain a new trial based upon an alleged *Brady* violation, Defendant must show (1) that the Government withheld favorable evidence, including impeachment evidence, (2) that he did not possess the evidence and could not have obtained it with reasonable diligence, and (3) that had the evidence been revealed, there is a reasonable probability that the outcome of the proceedings would have been different. *United States v. Perez*, 473 F.3d 1147, 1150 (11th Cir. 2006).

As discussed, the Government never had possession of the hard drives or copies. Since the Government never possessed the hard drives, or their mirrored images, there was no *Brady* or *Giglio* violation. Implicit in Defendant's argument is the contention that the Government was under a duty to preserve the hard drives, by taking "physical possession of the 3 desktop computers . . . ." (Dkt. 66, p. 6). Defendant's contention is unpersuasive. The FBI was not working in conjunction with the Orlando Police Department, the Polk County Sheriff's Office or the Florida Department of Law Enforcement. What those agencies knew cannot be imputed to the Government or the FBI. *See Moon v. Head,* 285 F.3d 1301, 1309 (11th Cir. 2002), *cert. denied,* 499 U.S. 982 (1981)(favorable

-11-

evidence must be shown to have been possessed by "a district's prosecution team, which includes both investigative and prosecutorial personnel.")(quoting *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989)). There was no *Brady* or *Giglio* violation as a result of the Government's unsuccessful attempt to locate the computers and hard drives.

When the prosecutor represented to defense counsel that the software and hardware from the computers no longer existed, that was in fact the Government's understanding, based on what the receiver and former employees of the dealership told Agent Kelly. (Dkt. 60-2, p. 2). Defendant has not shown that the Assistant United States Attorney prosecuting this case knowingly mislead, misrepresented or failed to disclose the existence and availability of the hard drives or any exculpatory information contained thereon. Absent bad faith on the part of the FBI, which Defendant does not allege, there is no *Brady* violation if the Government fails to preserve "potentially exculpatory" evidence. *Arizona v. Youngblood,* 488 U.S. 51, 57 (1989).

Even if duplicate hard drives are in the possession of the Orlando Police Department, Defendant can only speculate as to what a forensic examination of the hard drives would reveal and whether the financial data would be exculpatory or material to his defense. Defendant's theory of what a forensic examination of the hard drives would reveal is simply a new theory or avenue of defense, not newly discovered evidence. Defendant accordingly presents nothing which can be characterized as evidence, let alone newly discovered evidence or *Brady* material.

With respect to the financial data, Defendant has not shown that, had the hard drives been recovered by the Government and furnished to Defendant, the result of the proceeding would have been different. "[R]egardless of request, favorable, exculpatory or impeachment evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

-12-

have been different." *United States v. Noriega,* 117 F.3d 1206, 1218 (11th Cir. 1997) (quoting *Kyles v. Whitley,* 514 U.S. 419 (1995)). A reasonable probability of a different result is shown when the non-disclosure "undermines confidence in the outcome of the trial." *Kyles,* 514 U.S. at 434. Defendant's speculative contention of what a forensic examination of the hard drives would reveal, and how it could be used to further impeach Littlejohn and Roth, does not undermine confidence in the jury's verdict.

With respect to the suspected child pornography on Littlejohn's computer, as discussed, after the Government furnished Agent Kelly's FBI 302 form in which the receiver advised that he found "all kinds of pornography" on Littlejohn's computer, Defendant's attorney independently learned that child pornography had been found on Littlejohn's computer and that the Polk County Sheriff's Office had conducted an investigation. Defendant was therefore equipped to conduct relevant cross examination of Littlejohn, without regard to what the Government could have learned if it had possession of the hard drives, which it did not.

As to impeachment evidence, a constitutional error under *Brady* may arise from the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. *United States v. Bagley,* 473 U.S. 667, 678 (1985). Here, however, Defendant's attorney apparently knew more, or at least as much as the Government did about the Polk County Sheriff's Office's investigation of Littlejohn's computer. Even assuming that the Government "possessed" the information, Defendant already had it and chose not to use it when cross examining Littlejohn. The relevant inquiry is whether the suppression of this information undermines confidence in the trial. *See Kyles*, 514 U.S. at 434; *United States v. Scheer,* 168 F.3d 445, 451-52 (11th Cir. 1999). Here, it does not.

-13-

### *Hearing Unnecessary*

A hearing on Defendant's motion is unnecessary. The law of this circuit is well established that a motion for new trial may ordinarily be decided on affidavits without an evidentiary hearing. *United States v. Curry,* 497 F.2d 99 (5th Cir.), *cert. denied*, 419 U.S. 1035 (1974); *Lyles v. United States*, 272 F.2d 910 (5th Cir. 1959). The affidavits submitted by the parties provide the Court with sufficient information to determine the merits of Defendant's motions. *See Richardson v. United States,* 360 F.2d 366 (5th Cir. 1966); *Casias v. United States,* 337 F.2d 354 (10th Cir. 1964); *United States v. Hamilton,* 559 F.2d 1370, 1373 (5th Cir. 1977); *Williams v. United States*, 239 F. App'x 553 (11th Cir. 2007)(citing *United States v. Hamilton,* 559 F.2d at 1373-74)("In *Curry*, supra, we held that the acumen gained by a trial judge over the course of the proceedings made him well qualified to rule on the basis of affidavits without a hearing.").

Accordingly, Defendant's Motion for a New Trial Based on newly Discovered Evidence (Dkt. 56), Amended Motion for New Trial (Dkt. 63), and Second Amended Motion for New Trial (Dkt. 66) are DENIED in all respects.

**DONE AND ORDERED** in this $\underline{16^{TH}}$ day of May, 2008.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record

-14-